UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,                           Case Number 16-20436

v.                                           Honorable David M. Lawson

SHIRLEY DOUGLAS and MALIK
FUQUA,

           Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANT DOUGLAS'S MOTIONS TO SUPPRESS PHYSICAL EVIDENCE AND ELECTRONIC SURVEILLANCE EVIDENCE, AND DENYING DEFENDANT FUQUA'S MOTION TO DISMISS SUPERSEDING INDICTMENT

Defendants Shirley Douglas and Malik Fuqua, now represented by new counsel, filed several motions when they were representing themselves per their requests and when previous counsel represented them. The Court heard oral argument on the motions on August 7, 2018, ruled on many of them from the bench, and took three of them under advisement. Remaining to be decided are Douglas's motion to suppress evidence obtained in a search of a home and office spaces under a search warrant, Douglas's motion to suppress evidence obtained from a wiretap, and Fuqua's motion to dismiss the superseding indictment on vagueness grounds. For the reasons stated below, the motions will be denied.

### I. Facts and Proceedings

According to the first superseding indictment, from sometime in 2009 through 2016, the defendants owned and managed several entities that operated physical therapy and pain management clinics at various locations in Oak Park and Southfield, Michigan. Defendant Shirley Douglas owned and operated Abyssinia Love Knot Physical Therapy, LLC ("Abyssinia"), Abyssinia Group, Inc., and 1st Priority Guardianship. The clinics run by those entities employed

doctors who purportedly treated patients, and the entities submitted claims to Medicare and to Blue Cross Blue Shield of Michigan for physician office visits and physical therapy sessions. Douglas also owned and operated Abyssinia Church of God, Inc., which was a Michigan non-profit corporation chartered for the purposes of, among other things, "preaching the gospel," and "helping the marginalized." Defendant Malik Fuqua owned and operated 1st Priority Physical Therapy, LLC ("1st Priority"), which ran similar clinics at several other locations. He also submitted claims to Medicare and Blue Cross.

The government alleges that Douglas and Fuqua recruited patients and hired persons to locate patients who would supply their personal information to be used in false claims for services that were medically unnecessary or never performed. The patients and hawkers who found them allegedly were paid kickbacks out of the proceeds from those false claims. The defendants also hired doctors who would write prescriptions for pain medications that were medically unnecessary, and the drugs thusly obtained were passed on to the hawkers to sell for profit. In some cases, the defendants purportedly submitted claims for services provided to patients after those persons had died. They also concocted false medical documents such as MRI scan reports, toxicology reports, and records of prescriptions for submission to state monitoring agencies.

In Count 1 charging conspiracy to commit healthcare and wire fraud, the government alleges that the conspiracy operated from August 2009 through June 2016, and that, in all, the various entities operated by the defendants submitted false claims to Medicare totaling more than $36 million and to Blue Cross for more than $5 million.

In Counts 2 through 5 charging healthcare fraud, the indictment identifies two specific claims submitted by Abyssinia (operated by Douglas) in January and August 2013, seeking

reimbursement for between $120 and $225 for services purportedly provided to two different patients of the clinic, identified by pseudonyms, and two other claims submitted in March and April 2016 by 1st Priority (operated by Fuqua), for similar services and amounts for two other patients.

In Count 6 charging conspiracy to pay healthcare kickbacks, the indictment alleges that, on May 23, 2015, Douglas "advised a co-conspirator to pay kickbacks to Medicare beneficiaries in exchange for their insurance information." First Superseding Indictment at 19, ECF No. 113, Page.ID 511.

In Count 7 charging conspiracy to distribute controlled substances, the government alleges that from August 2009 to June 2016, the defendants conspired to distribute controlled substances, namely oxycodone, oxymorphone, hydrocodone, alprazolam, and codeine phosphate, via the issuance of prescriptions for those drugs that were outside the course of usual medical practice and not for any medically legitimate purpose.

In Count 8 charging maintenance of a drug-involved premises, the government alleges that from November 2010 through August 2015 the defendants operated their various clinics for the purpose of distributing controlled substances, including in particular the Abyssinia and 1st Priority facilities at 18591 and 18597 West 10 Mile Road, in Southfield, Michigan.

In Count 9 charging conspiracy to commit money laundering, the government alleges that from January 2014 through September 2015, the defendants conspired to execute various unspecified transactions involving interstate commerce with the purpose of dissipating, concealing, and otherwise obfuscating the location, source, and ownership of funds obtained from their healthcare fraud and drug distribution schemes.

Finally, in Counts 10 through 13 charging money laundering against defendant Douglas only, the indictment identifies four online transfers of funds on dates between February and August 2015 moving money between the accounts of Abyssinia Love Knot Physical Therapy, LLC and Abyssinia Church of God, Inc., which the government alleges were intended to conceal the location, source, or ownership of illegal proceeds from Douglas's clinic.

On June 16, 2016, defendants Shirley Douglas and Malik Fuqua were charged in a six-count indictment with healthcare fraud and controlled substance violations. On June 27, 2016, the Court issued a scheduling order and initially set the jury trial to begin on August 16, 2016. The proceedings subsequently were adjourned five times at the defendants' request. In the Court's December 14, 2016 order adjourning the trial and excluding time, the Court noted that the government had indicated that it might seek a superseding indictment, and the Court set a deadline for filing.

On January 30, 2018, the government filed a first superseding indictment, which contained the thirteen counts described above. Because of competency proceedings relating to defendant Douglas, and the appearance of new attorneys, the Court adjourned the trial two more times. It is scheduled to begin April 9, 2019.

In the original indictment, defendant Frank Middleton also was charged as a participant in the conspiracies to commit healthcare and wire fraud and to obtain controlled substances by fraud. He pleaded guilty to those crimes on January 17, 2018. Middleton died on March 31, 2018, before he was sentenced, and the government filed a motion to dismiss the indictment against him only, due to his demise, which was granted.

## II.  Defendant Douglas's Motions
### A.  Motion to Suppress Evidence from Physical Searches

Douglas contends that the August 2015 execution of a federal search warrant covering 5110 West Doherty, West Bloomfield, Michigan (Douglas's residence), 18597 West Ten Mile Road, Southfield, Michigan (the Abyssinia Love Knot Clinic), and 18591 West Ten Mile Road, Southfield, Michigan (the 1st Priority Medical Clinic) violated the Fourth Amendment because the affidavit in support of the warrant failed to establish probable cause, the affidavit was based on stale information, and the good faith exception to the exclusionary rule does not apply.  That motion, however, is unsupported by any developed argument or citations from the record to support the defendant's position.  The defendant devoted the bulk of her motion and brief to boilerplate recitations of well-established points of Fourth Amendment law, and she does not present any developed argument to support her assertions that "there is no probable cause to issue the warrant because the confidential sources' allegations about criminal activity are merely conclusory, and contain insufficient information about the basis of knowledge," that "[t]he information [recited in the affidavit] was vague, unsupported, uncorroborated or stale," and that "[t]he affiant in this case simply stated his 'hunch' that evidence of crimes would be found in the target premises."  The defendant contends that "[t]he length of the affidavit cannot make up for its lack of substance," and that the "allegations regarding the target premises are so vague and lacking in factual support as to be totally conclusory and/or meaningless."  But she does not offer a single citation from any passage in the extensive narrative of the 82-page warrant affidavit to support any of those unelaborated assertions.

"A search is generally unreasonable if it is not conducted pursuant to a warrant issued upon probable cause."  *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (citing

*Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528-29 (1967)). "Probable cause exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'" *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)).

The affidavit in support of the warrant offers extensive details describing the conclusions that investigators had reached through their investigation, how they had corroborated those conclusions through various means, and the information they had suggesting that the several confidential informants on whom they relied were credible. The affiant, an investigator who participated personally in the investigation, attested that the premises pertinent to this motion were Douglas's home and two medical clinics known to be operated by her. The Michigan Automated Prescription System ("MAPS") records for the clinics revealed that they employed doctors who had issued numerous prescriptions for controlled substances. The clinics also were enrolled as Medicare Part B providers and had submitted extensive claims for reimbursement of medical bills through Medicare.

The affidavit recited information proffered by several unnamed informants including (1) a former patient of the clinic who had received a copy of a Medicare billing for medical services that she never received, and who told investigators that she was offered $5,000 by a person at the clinic to refrain from reporting the billing to police; (2) a patient who described the workings of the clinics and told police that doctors there did not provide any legitimate medical services, that patients were prescribed medications without any medical exams, and that they were paid in cash and pills in exchange for providing their personal information to be used in false billings; (3)

another patient who stated to police that he was conveyed to Douglas's clinic by one of the clinic's recruiters, met with a doctor there for around five to seven minutes, during which the doctor wrote five prescriptions for pain medications without performing any examination, and then, after the patient left the clinic and had the prescriptions filled, he was driven to a pharmacy in South Bend, Indiana, where an associate of the recruiter (apparently his girlfriend) presented the prescriptions to be filled and paid for them in cash, while the patient was seated in the pharmacy waiting area; (4) a former medical technician who worked at the clinic, who told police that most patients who visited had no need for any pain management services, and that she personally was told by patients that they were sent to the clinic and paid cash to obtain narcotics that they did not need; (5) a former "recruiter" for Douglas's clinic who described how recruiters paid doctors there between $450 and $1,000 for each patient visit, and how patients would receive $100 for per visit, with any drugs prescribed being passed on to the recruiter to be sold for profit; and (6) a doctor who formerly had worked for the clinic, who told police that he personally saw a minimum of 15 to 20 patients each day during a five or six hour shift, that Douglas supervised all of the operations and coordinated the "marketers" or "recruiters" who brought patients in, that only about 1 in every 150 patients who visited the clinic had any legitimate need for medical pain management, that the informant was fired after refusing to prescribe unnecessary narcotics, and that the clinic frequently billed Medicare and insurers for services such as MRI scans that never were performed.

Of course, "[w]hen an affidavit relies on hearsay information from a confidential informant, the judicial officer (and reviewing court) must consider the veracity, reliability, and basis of knowledge for that information as part of the totality-of-the-circumstances review." *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010). "This is a 'practical, commonsense

decision.'" *Ibid.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The affiant may substantiate an unnamed informant's reliability either by "attest[ing] 'with some detail' that the informant provided reliable information in the past," or by "indicat[ing] that the police [have] corroborated significant parts of the informant's story." *Ibid.* "'As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause.'" *Id.* at 307-08 (quoting *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005)).

The affiant also attested that many aspects of the unnamed informants' stories had been corroborated by police including through (1) conversations with a pharmacist in Stevensville, Michigan, a considerable distance from Detroit, who remembered seeing several patients of the clinic come in to have prescriptions for pain medication filled; (2) an undercover operation in which a government informant had a meeting with former defendant Frank Middleton in the parking lot outside Douglas's clinic, and later discussed during a recorded phone call that the informant could bring patients to the clinic, pay $400 for each visit, and receive narcotics such as Xanax and Oxycontin in return; (3) conversations that one of the government's agents had with two unnamed persons during a visit to Douglas's clinic, in which those persons described arrangements where recruiters could bring in patients and pay $450 per visit, receiving prescribed medications in return.

The affiant also recited that a separate search warrant had been executed at the home of Katherine Woods, where agents recovered numerous prescription bottles and prescriptions with the names of persons other than Woods, MAPS reports covering prescriptions issued to numerous persons, quantities of prescription drugs, and patient files and Medicare cards. When agents

interviewed Woods, she told them that she had worked as a recruiter at Douglas's clinic for around four years, that she brought patients to the clinic and paid $450 per "slot" or patient visit to the receptionist at the clinic ("Rhonda"), that she paid each patient $100 for attending a visit, and that in return she collected and sold medications from the patients' prescriptions, which doctors wrote without performing any medical exams. Woods also told the government that she discussed with Douglas via text messages and voice calls the recruiting arrangement and payments she would make and receive, and she disclosed her text message and call logs. "[A] known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility and the informant has never provided information to the police in the past," particularly where a named and identified informant has exposed herself to possible criminal prosecution based on information provided by her to police. *United States v. Kinison*, 710 F.3d 678, 682-83 (6th Cir. 2013).

Finally, the affidavit included an extensive recitation of the government's analysis of records of prescriptions issued through the clinic from the MAPS database, along with claims submitted to Medicare, which revealed the extreme volume of prescription drugs dispensed through Douglas's operation and the huge volume of billing for prescription drugs and supposed physical therapy services for numerous patients of the clinic.

All of those details certainly suffice to suggest a reasonable probability that evidence of the fraudulent billing and pill mill operations would be recovered at Douglas's home and her several clinics. To the extent that the affiant presented information from unnamed informants, those stories amply were corroborated by information given by Katherine Woods, who was identified by name, and who was indicted on separate charges. The details that Woods described

precisely correlated with accounts supplied by other informants and therefore supplied an independent basis, along with the other background information obtained by the government through record reviews, to substantiate all of the informants' accounts.

Douglas contends that the information was "stale." "[S]tale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377-78 (6th Cir. 2009). However, "[t]he staleness inquiry depends on the 'inherent nature of the crime.'" *Ibid.* (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). "In analyzing whether information is stale, [the] court considers the following factors: (1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the place to be searched (mere criminal forum of convenience or secure operational base?)." *Id.* at 378 (quoting *United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006)). These factors are not elements that must be met for the government to avoid suppression of the fruits of a search; instead they are circumstances to be weighed in deciding whether the information in the affidavit was sufficiently fresh to inform the probable cause determination. *United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015). "The function of the staleness inquiry is not to set an arbitrary time limit within which the facts must be presented in a warrant application." *United States v. Yates*, 501 F. App'x 505, 511 (6th Cir. 2012).

The pertinent factors weigh in favor of finding that police reasonably could expect to find evidence of a large scale, ongoing criminal enterprise in the locations searched. The suspected scheme was a long running conspiracy with frequently recurring operations, with informants, including Woods, having worked for Douglas for up to four years. Douglas's home and the several

clinics were secure bases of operations through which the scheme was carried out, and Douglas certainly appeared "entrenched" in her operations at the clinics, having conducted them in similar fashion at the same locations for years. The scheme also necessarily generated extensive paper and electronic records that could be expected to reflect the vast scope and volume of the clinic operations, and that evidence would not be either perishable or rapidly discarded, since much of it would relate to billings to Medicare and insurance companies, which the clinics would be required to retain for some time.

The defendant has offered no developed argument and did not cite any portion of the record to support her position that the affidavit did not suffice to establish probable cause for the search of her home and clinics, and her vestigial arguments are frivolous in light of the actual record. The motion to suppress the physical evidence (ECF No. 130) will be denied.

B. Motion to Suppress Wiretap Evidence

On May 14, 2015, the government obtained an order authorizing Title III electronic surveillance of Dougals's telephone under 18 U.S.C. 2518. The government filed a 15-day report on May 28, 2015, and a 30-day report on June 12, 2015. The interception ended on June 13, 2015, but the government sought and obtained a renewed intercept order on July 30, 2015. Douglas seeks suppression of all evidence gathered under both orders. She argues that all evidence obtained must be suppressed because the affidavits of the government agents that supported both applications failed to establish the requisite "necessity" for the surveillance. 18 U.S.C. 2518(1)(c) ("Each application [under this section] shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed, or why they reasonably appear to be unlikely to succeed if tried, or to be too dangerous.").

"In order to conduct electronic surveillance using a wiretap, federal law enforcement officials must secure authorization by making an application containing 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017) (quoting 18 U.S.C. § 2518(1)(c)). "This provision, commonly referred to as the 'needs statement provision,' was designed to insure that wiretapping is not resorted to in a situation where traditional investigative techniques 'would suffice to expose the crime.'" *Ibid.* (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)). "'[W]hat is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation.'" *Ibid.*

The affidavit in support of the wiretap order sets forth a narrative of the investigation by the government's agents that is replete with details of the "pill mill" operation uncovered through conventional means, such as interviewing witnesses who described the inner workings of the clinics from personal knowledge. One notable example is a witness referred to as "Source of Information 8" ("SOI-8"), who told investigators that he had worked for around four years as a "recruiter" for defendant Douglas through the Abyssinia Love Knot Clinic. SOI-8 stated that he would bring new patients to the clinic once or twice a week, where, after a short office visit with Dr. Atul Shah, the patient would receive a prescription for medications such as Xanax or Oxycodone. SOI-8 then would pay the patient $100 for the medication that was prescribed, which he would keep and resell to other persons. For each "patient slot" or new patient he was allowed to bring into the clinic, SOI-8 paid the front desk receptionist at the clinic ("Rhonda") $450, and in some cases an extra $30 for a urinalysis screening.

SOI-8 consented to a search of his cell phone, which revealed an exchange of text messages between himself and Shirley Douglas (at the number for which surveillance was sought), describing in detail how the patient referrals should be handled and how payments would be made. Farrell Aff., ECF No. 131, Page.ID 751-53. The call log on the phone also indicated that SOI-8 and Douglas had voice conversations, and SOI-8 told investigators that during those conversations they had discussed the commission that would be paid for patient "slots," and the benefits that SOI-8 would receive for those "slots" by keeping medications obtained by patients via the prescriptions issued by doctors at the clinic. *Id.* ¶ 50, Page.ID 754. The affiant went on to transcribe the substance of a phone conversation that occurred via a recorded jail telephone line between defendant Douglas and former defendant Middleton, when Middleton was in jail on a sentence for an unrelated drunk driving charge. During that call Douglas and Middleton discussed how Middleton's weekly allotment of four "slots" at the clinic would continue to be filled by an associate of Middleton, and that Middleton would continue to earn the same revenue that he previously had received from bringing in patients personally. *Id.* ¶ 51, Page.ID 754-57.

The affiant wrote that surveillance of Douglas's phone calls was necessary because the government's agents believed that the clinic operation involved a large network of recruiters who would bring patients in, but they had been unable to determine the full scope of the operation by conventional means of investigation. The agent stated that "traditional investigative techniques utilized thus far have included use of confidential sources, undercover agents, trash retrievals, acquisition and evaluation of toll records for [the target phone numbers], and physical surveillance," and that, through the wiretaps agents hoped to gain recordings of Douglas speaking directly with other recruiters, so that those persons and the nature and extent of her arrangements

with them could be discovered, and information given by sources such as SOI-8 could be confirmed. *Id.* ¶¶ 57-60, Page.ID 763-65. The agent attested that further information was unlikely to be forthcoming from sources already exploited, since the principal confidential sources all had ended their relationships with the clinic, or could not be located by police. *Id.* ¶ 61 Page.ID 765-66. The agent further opined that techniques such as physical surveillance and inserting undercover agents as recruiters had been tried, but with little success since much of the business of the clinics was conducted out of sight, in person or by telephone, and the government had not successfully inserted an agent into a recruiter role with a level of access and interaction with Douglas that confidential sources had reported. *Id.* ¶¶ 62-66, Page.ID 766-68.

The affidavit in support of the wiretap request amply establishes that the government diligently considered, and tried, alternative conventional means of investigation, and that those other means were unlikely to achieve the ends of the investigation of fully exploring the scope of the defendants' fraudulent billing and drug selling operation. The narrative of the investigation reciting the extensive evidence gathering before wiretaps were sought shows that "'wiretaps [were] not being routinely employed as the initial step in criminal investigation.'" *Young*, 847 F.3d at 343 (quoting *Alfano*, 838 F.2d 158, 163). "The government 'is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.'" *Id.* at 344 (quoting *Alfano*, 838 F.2d at 163). "'All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" *Ibid.* (quoting *Alfano*, 838 F.2d at 163-64).

In this case, the description of the evidence gathered through several confidential informants, pen register traces, limited in-person infiltrations of the clinic, trash pulls, physical surveillance, and record searches from various accessible databases, shows that the government gave "serious consideration to . . . non-wiretap techniques," and had in fact tried many alternative means for gathering information before a wiretap was sought. And the government's agent also plausibly explained how a wiretap on Douglas's phone could be expected to reveal the identities of other participants in the conspiracy, as well as the full extent of the operation, by allowing agents to listen in on phone calls that agents reasonably could expect that Douglas would have with other recruiters like SOI-8, and with other principals in the conspiracy like former defendant Middleton. In particular, the investigator also attested that more direct evidence of the illegal nature of the clinics' dealings with recruiters and patients was needed, which only could be expected to come from conversations between Douglas and her confederates, because other observations such as analyses of records showing a high volume of prescriptions written by doctors conceivably could have been produced by legitimate as well as illegitimate operations. Those explanations are sufficient to show that alternative means of investigation had been tried and found wanting, and that the proposed wiretap was likely to produce additional crucial information about the extent of the criminal activity.

Douglas fixates on the affiant's "terse rejection" of possible avenues such as grand jury subpoenas, which she contends were dismissed without any convincing showing that they would not be productive. But the agent's assertion that official grand jury investigations would not likely produce information about the scope of the conspiracy is plausible in light of (1) information from confidential informants relating how Douglas and other principals at the clinics (Fuqua and

Middleton) had dealt with them one-on-one, and how they were "assigned" to bring patients only to a single physician, who was not chosen by the recruiter; and (2) the fact that the government had been unable to identify other individuals who worked as recruiters or in other roles at the clinic, which naturally would impose a significant obstacle to the government in any effort to locate those persons and subject them to investigative subpoenas.

The information from the wiretaps was obtained in accordance with Title III's requirements. The motion to suppress that evidence (ECF No. 131) will be denied.

### III. Defendant Fuqua's Motion to Dismiss Superseding Indictment

Fuqua contends that the statutes under which he is charged and related provisions in 42 U.S.C. § 1320a-7b(h) and 18 U.S.C. § 1346 are unconstitutionally vague. He also alludes to "vagueness" in the drug conspiracy charge, 21 U.S.C. § 846, but he does not offer any discernible explanation or cite any legal authority criticizing any provision of that statute for vagueness.

This motion is only somewhat coherent, and it is difficult to discern the bases of the defendant's arguments. The defendant's briefing also comprises large segments where he merely recites general principles of law and cites various legal authorities, with no attempt to connect them to the issues presented through any developed argument. However, affording it the most generous construction possible, the Court construes this motion as presenting four grounds for dismissal: (1) several of the statutes under which Fuqua is charged are unconstitutionally vague; (2) the healthcare fraud and conspiracy charges are defective because the defendants were not "healthcare providers"; (3) the conspiracy charges are "vague" because they do not specify certain details such as names of conspirators and precise dates; and (4) several other charges are unsound due to the absence of any allegation of certain supposed elements.

The Supreme Court has described a void-for-vagueness doctrine emanating from the Fifth Amendment's Due Process Clause that "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, --- U.S. ---, 138 S. Ct. 1204, 1212 (2018); *see also Johnson v. United States*, --- U.S. ---, 135 S. Ct. 2551, 2556-57 (2015). "The basic Constitutional standard by which to judge the sufficiency of an indictment is mandated by the Sixth Amendment which requires that the indictment inform the defendant of 'the nature and cause of the accusation.'" *United States v. Piccolo*, 723 F.2d 1234, 1238 (6th Cir. 1983) (quoting U.S. Const., Amend. VI). "This standard is expressed by Federal Rule of Criminal Procedure 7(c)(1), which states, in part, that the indictment 'shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.'" *Ibid.* To satisfy that standard, the indictment must charge all the elements of an offense, sufficiently apprise the defendant of the allegations he must defend against, and be specific enough to allow him to plead a conviction or acquittal as a bar "in case any other proceedings are taken against him for a similar offense." *Ibid.* (quoting *Russell v. United States*, 369 U.S. 749, 763-64 (1962) (quotation marks and alterations omitted)).

Fuqua has not identified any constitutional defect in either the pertinent statutes or the indictment.

The government concedes that the Sixth Circuit has not confronted a vagueness challenge to the Medicare Anti-Kickback Statute. But other circuits that have considered the issue unanimously have rejected the same arguments advanced by the defendant here. *United States v. Nagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017) ("'[N]othing in the Anti-Kickback Statute implies that only the primary motivation of remuneration is to be considered in assessing the conduct at issue,'" and, therefore, "the Anti-Kickback Statute is not unconstitutionally vague as applied.");

*United States v. Starks*, 157 F.3d 833, 840 (11th Cir. 1998) ("[W]e agree with the district court that the Anti-Kickback statute gave [the defendants] fair warning that their conduct was illegal and that the statute therefore is not unconstitutionally vague.") (quoting *United States v. Borrasi*, 639 F.3d 772, 782 (7th Cir. 2011)); *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("The [anti-kickback] statute gives fair warning of what is prohibited and is not unconstitutionally vague.").

The federal courts also uniformly have rejected vagueness challenges to charges for mail and wire fraud under 18 U.S.C. §§ 1341, 1343, and the definitional language of section 1346, as long as the charging language is confined to allegations that the defendant paid bribes or kickbacks, following the rule laid down by the Supreme Court in *Skilling v. United States*, 561 U.S. 358 (2010). *See* 18 U.S.C. § 1346 ("For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."); *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015) ("[I]n [*Skilling*], the Justices deflected a contention that [18 U.S.C. § 1346] is so open-ended as to be unconstitutionally vague. They did this by holding that § 1346 covers only bribery and kickbacks."); *United States v. Garrido*, 713 F.3d 985, 988 (9th Cir. 2013) ("[T]he Supreme Court in [*Skilling*], narrowed the scope of 18 U.S.C. § 1346 to include only honest services fraud based on bribery and kickback schemes."); *Bereano v. United States*, 706 F.3d 568, 575 (4th Cir. 2013) ("In *Skilling*, an appeal by a former Enron executive, the Court circumscribed the prosecution's use of § 1346 in mail fraud prosecutions, limiting it to those cases involving actual bribery or kickbacks."). In this case the indictment squarely alleges that Fuqua paid and conspired to pay kickbacks to patients and hawkers in return for their participation in his scheme to obtain the personal information of

numerous visitors to the defendant's clinic, to be used in submitting false claims for reimbursement to Medicare and private insurers, for services that were medically unnecessary or never performed.

Fuqua argues that the drug conspiracy charge under 18 U.S.C. § 846 is defective due to the omission of certain details.  But the Sixth Circuit has rejected such arguments in the face of charging language that adequately frames the temporal span, overall scope, and purpose of the conspiracy, notwithstanding the omission of details such as the names of co-conspirators. *United States v. Piccolo*, 723 F.2d 1234, 1239 (6th Cir. 1983) ("The case authorities are concise that a valid indictment may charge a defendant with conspiring with persons whose names are unknown."); *United States v. Vassar*, 346 F. App'x 17, 19-20 (6th Cir. 2009) ("Courts have found indictments insufficient where they are open-ended as to both beginning and end dates, but sufficient where they fix the end of the conspiracy and provide an approximate start date." (citations omitted)).

Fuqua also argues that the healthcare fraud counts fail to state an offense because he was not a "healthcare provider" as defined under certain regulations, and because the indictment variously refers to him as both a "healthcare provider" and a "Medicare administrative contractor." "To be guilty of healthcare fraud under 18 U.S.C. § 1347, a defendant must have knowingly and willfully executed a scheme to defraud a government health care program like Medicare." *United States v. Gevorgyan*, 886 F.3d 450, 455 (5th Cir. 2018) (quotations omitted). "Further, under 18 U.S.C. § 1349, '[w]illfully joining with another to engage in such a scheme, with awareness of the agreement's unlawful purpose, is a conspiracy to commit healthcare fraud." *Ibid.*

Fuqua has not pointed to any legal authority holding that the criminal statutes involved in this case are limited to punishing only "doctors" or "physicians."  The cases on point have held

that the criminal provisions are intended broadly to punish all species of healthcare fraud. The plain language of the healthcare fraud statute punishes "whoever" carries out any scheme to defraud involving healthcare benefits or claims. 18 U.S.C. § 1347 ("*Whoever* knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.") (Emphasis added). As the Third Circuit has observed, "the Anti-Kickback Statute and False Claims Act were not drafted to cabin healthcare providers' liability for certain types of false claims or for certain types of illegal kickbacks. Instead, Congress intended both statutes to reach a broad swath of 'fraud and abuse' in the federal healthcare system." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96 (3d Cir. 2018).

Confronting a trial record strikingly similar to the allegations in the indictment here, the Fifth Circuit in *Gevorgyan* readily concluded that the government had made out its case for healthcare fraud and conspiracy to commit healthcare fraud. In that case, the defendant trained personnel and supervised the patient intake process, the clinics only took Medicare patients, the defendant was centrally involved in the recruiting scheme where kickbacks were paid to recruiters who brought in patients without regard to their actual need for medical services, and he owned an entity that served as "the repository of the fruits of the Clinic's healthcare fraud." The court held that this evidence taken together established the conspiracy charge. *Gevorgyan*, 886 F.3d at 456.

Moreover, charges of healthcare fraud may be sustained by proof that a defendant submitted claims to Medicare accompanied by a certification that he has complied with the prohibition on paying kickbacks to patients or other persons, when in fact the defendant knows that such kickbacks were paid. *United States ex rel. Colquitt v. Abbott Laboratories*, 858 F.3d 365, 371 (5th Cir. 2017) ("The Anti-Kickback Statute makes it a crime to pay someone to 'refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" (quoting 42 U.S.C. § 1320a-7b(b)(2)(A)). "If a provider has violated the statute, then claims he or she submits to Medicare may be false claims when the provider certified compliance with the kickback statute in submitting a claim." *Ibid.*

Fuqua also contends that he is entitled to dismissal under the "Safe Harbor" provisions of 42 C.F.R. § 1001.952. But the courts that have considered that regulation have found that it comprises an affirmative defense to charges of healthcare fraud. *United States v. Barnes*, 126 F. Supp. 3d 735, 745 n.65 (E.D. La. 2015) (citing *United States v. Crinel*, No. 15-61, 2015 WL 3755896, at *2 (E.D. La. June 16, 2015) (holding that the safe-harbor provision in 42 U.S.C. § 1320a-7b(b)(3)(B) is an affirmative defense); *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (holding that the safe-harbor provision in 42 C.F.R. § 1001.952(d) is an affirmative defense); *United States v. Davis*, No. 14-171, 2014 WL 6679199, at *5 (S.D. Tex. Nov. 25, 2014) (same)). "'It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses.'" *United States v. Titterington*, 374 F.3d 453, 456 (6th Cir. 2004) (quoting *United States v. Sisson*, 399 U.S. 267, 288 (1970)). "'[A]n indictment . . . founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception

made by a proviso or other distinct clause. . . . [I]t is incumbent on one who relies on such an exception to set it up and establish it.'" *Ibid.* (quoting *McKelvey v. United States*, 260 U.S. 353, 357 (1922)); *see also Evans v. United States*, 153 U.S. 584, 590 (1894) ("Neither in criminal nor in civil pleading is [the Government] required to anticipate or negative a defense.").

Finally, Fuqua asserts that the mail fraud charges are defective because the indictment does not allege that he received any "personal gain" from the kickback scheme or that he engaged in any "deceptive conduct."  But the government is not required to prove any "personal gain" in order to secure a conviction for mail or wire fraud, as the First Circuit recently explained when confronting the trial proofs of a similar kickback scheme. *See United States v. Melendez-Gonzalez*, 892 F.3d 9, 17 (1st Cir. 2018) (holding that "the prosecution did not need to prove that Costas actually received any kickbacks. It was sufficient to show that Costas, by giving Meléndez the personal information of enlistees, purposefully caused him to use that information fraudulently to procure unearned bonuses").  And, contrary to the defendant's position, the indictment is profuse with specific allegations of "deceptive conduct" in which Fuqua engaged by paying patients to submit information to be used in thousands of claims for medical services that were not medically necessary or never performed, most conspicuously by billing Medicare and private insurers for office visits in which doctors provided no medical treatment and conducted no exams, as well as instances where reports of tests such as MRI scans were fabricated, where no such scans ever were made.

Defendant Fuqua's vagueness challenges to the superseding indictment and the charging statutes are not supported by the applicable law.

## IV. Conclusion

There were no constitutional or statutory violations in the searches conducted or the wiretaps performed. The superseding indictment is not vague, nor are the charging statutes.

Accordingly, it is **ORDERED** that defendant Shirley Douglas's motion to suppress physical evidence (ECF No. 130) and her motion to suppress the fruits of electronic surveillance (ECF No. 131) are **DENIED**.

It is further **ORDERED** that defendant Malik Fuqua's motion to dismiss the superseding indictment (ECF No. 138) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: March 22, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on March 22, 2019.

s/Kim Grimes
KIM GRIMES

---